CASE 53—CONFLICT OF LIENS—Nov. 23.

# Montgomery, Etc. v. Allen, Etc.

APPEAL FROM SCOTT CIRCUIT COURT.

STATEMENT.

Two corporations formed a scheme of consolidation involving an enlargement of their respective plants and the extinguishment of the outstanding stock by issuing bonds to the extent of $60,-000, out of which the stockholders of the old companies were to receive 25 per cent. of their holdings and the residue were to be used so far as they could be sold to pay for the improvements. Contracts were made for the improvements. The consolidated company failed. This controversy arose over a contest between the contractors who had filed mechanic's liens and the bond-holders. The validity of the bond issue was questioned. It is held by the court:

1. FRAUDULENT PREFERENCE.—The mortgage having been duly executed, could only be set aside as a fraudulent preference upon a petition of some person interested, filed within six months after it was put to record. This not having been done, it was error to adjudge the mortgage and bonds invalid as a frudulent preference.

2. CORPORATIONS—VALIDITY OF BOND ISSUE.—In the absence of a complaint by the stockholders who authorized the issue, the validity of the issue of bonds by the corporation which received the proceeds can not be questioned by persons who were themselves involved in the scheme of which the bond-issue was a part.

3. MECHANICS' LIENS—TITLE PERFECTED AFTER FILING A STATEMENT. The fact that the party upon whose property a mechanics' lien was asserted did not have title to the realty on which the improvements were made at the time they were begun does not affect the mechanics' lien thereon, the property having been conveyed to it subsequently pursuant to the agreement between the two corporations.

4. MECHANICS' LIENS—CONSTITUTIONALITY OF THE STATUTE.—The mechanics' liens act of 1891-2-3 is not unconstitutional as the parties must themselves all be presumed to have contracted with reference to their rights as fixed by it.

5. SAME—STREET RAILWAY.—The language "railroad . . . or other public improvement in this Commonwealth," used in section 30

of the mechanics' lien law of 1891-2-3, includes an electric street railway.

6. SAME—EFFECT OF AMENDING MECHANICS' LIEN LAW.—As all of the mechanics' liens in controversy were created before the act of March 21, 1896, took effect, they are controlled by the act in force at the time the lien accrued except that that act extended the time within which the liens might be filed; provided, the claimant had not lost his lien by lapse of time when the new act came into effect.

W. S. PRYOR AND GEORGE W. PREWITT FOR APPELLANTS

(Brief not in the Record.)

OWENS & FINNELL FOR THE APPELLEES.

1. On the authority of the company to issue bonds:   6 Waits, Actions and Defenses, 683-4-5; 69 Penn. St., 426; Wood on Railways, vol. 1, p. 53; 2 Morawetz on Corporations, secs. 618-9, 652-3-4; 13 Mass., 515; Michigan Supreme Court Reports, vol. 45, p. 103.

2. There is no plea of the consolidation of the companies nor are there any facts pleaded which amount to a consolidation.

3. As to the existence of the property:   Hutchinson, &c., v. Ford, 9 Bush, 319; 68 U. S., 254; 94 Ky., 271; 78 U. S., 459; 20 L. ed., 199; 15 Ky. Law Rep., 70; 5 Ky. Law Rep., 185; Pomeroy's Eq. Jur., secs. 1235, 1236; 1 Story's Eq., secs. 395, 396, 397; Jones on Liens, sec. 542.

4. As to priorities:   Jones on Mortgages, sec. 163; Jones on Liens, vol. 1, sec. 77; 1 Story's Eq., 410; Pomeroy's Eq., vol. 3, sec. 1235; 86 Ky., 682.

5. As to statutory liens of materialmen having precedence over prior mortgage.  Jones on Liens, vol. 2, sec. 1457; 1 L. R. A., 778; Phillips on Liens, ch. 17; Brown v. Morrison, 5 Ark., 221; 16 Ky. Law Rep., 646.

6. As to alleged lien of the Buckeye Engine Co.  16 Ky. Law Rep., 646.

7. Sulzer-Vogt contract as to keeping clear of liens:.  Ky. Cit. Bldg. & L. Assn., decided March 11, 1899.

8. Question of liens on street railways:   2 Duv., 175; 2 L. R. A., 693; Pierce on Railroads, 262; Elliott on Roads and Streets, 558; Mills on Eminent Domain, sec. 205; Lewis on Eminent Domain, sec. 124; Rorer on Railroads, sec. 1425; Front St. Cable R. R. Co. v. Johnson, 2 L. R. A., 693; 125 Mass., 515.

JAMES Y. KELLY AND WILLIAM S. KELLY ON SAME SIDE.

The materialmen stand upon the same footing as the bond-holder upon the question of the illegality of the contract.

The remainder of counsel's brief is devoted to a discussion of the facts.

GEORGE C. PREWITT for APPELLANTS IN RESPONSE TO BRIEFS FOR APPELLEES.

1. It has been repeatedly held that an assignment of a mechanics' claim carried with it a mechanics' lien. 98 Ky., 26.

2. Corporations become answerable under many circumstances for the *ultra vires* fraudulent or tortious acts of their officers and agents, though such acts are not authorized in their charters. 4 Thompson, sec. 5639. In every case a corporation must account for benefits which it has received under an *ultra vires* transaction. 16 Ky. Law Rep., 881; 11 Ky. Law Rep., 309.

OWENS & FINNELL for APPELLEES IN PETITION FOR A REHEARING AND MODIFICATION OF THE OPINION.

JUDGE HOBSON DELIVERED THE OPINION OF THE COURT.

The Georgetown Street Railroad Company was incorporated by an act of the General Assembly approved May 1, 1888 (see Session Acts 1887-88, volume 3, page 694). Under the charter the capital stock was not to exceed $10,000, but on the subscription of $2,000 the company might be organized. It was authorized to construct and operate a street railway in Georgetown, Ky. This it did.

The Georgetown Ice Company was incorporated under the General Statutes, March 19, 1890, for the purpose of erecting and operating in Georgetown a factory for the manufacture of ice, and dealing in ice, either manufactured or natural. The highest amount of indebtedness which the corporation should incur, according to the articles, was $4,000 above the cost of construction. The capital stock was fixed at $20,000, to be paid in as the directors might determine. The corporation was duly organized, and erected its plant.

About the first of the year 1896, when the two corporations had been carrying on business as contemplated in their charters since their organization, the street railway

being a mule line, and the ice factory a three-ton plant, some one conceived the idea of uniting the two corporations, making the street railway an electric line, the ice factory a fifteen-ton plant, and operating both by the same motive power. In order to carry out this plan, on February 17, 1896, an order was made by the directors of the ice company and of the street-car company reciting that more than two-thirds of the stockholders in each company had given to C. H. Williams, and his associates to be named by him, an option in writing upon their stock; that a sufficient basis of credit had been acquired to enable them to contract for the erection of the electric railroad and the fifteen-ton ice plant. The order then directed the purchase of certain real estate, and contracts to be let for the buildings, machinery and all things necessary for the completion of the plant.

Though no record was made at this time, it appears to have been agreed that $60,000 of first mortgage bonds were to be issued on this new plant of the two companies; that the stockholders in the two companies were to surrender their stock at twenty-five cents to the dollar, and take bonds therefor; that, of the remaining bonds, as many as could be placed were to be subscribed for in Georgetown, and a committee was appointed to solicit these subscriptions, a printed blank having been prepared for this purpose, reciting the facts referred to. Contracts were then made for the electric railway and fifteen-ton ice factory, the total cost of which aggregated about $35,000. Subscriptions for the bonds were obtained in Georgetown to the amount of $9,000, at par, payable in four equal monthly installments, beginning March 1, 1896. These subscriptions were paid, but no bonds were issued until July 27, 1896.

A resolution was then adopted by the stockholders of the street railway company authorizing the issue of the $60,000 worth of bonds each for $100, and agreeing to take them for their stock at $25 a share. Substantially the same action was taken by the directors and stockholders of the ice company as by those of the railway company. The bonds were then issued, and $3,975 worth of them were delivered to the stockholders in the two companies, and their stock surrendered. Bonds were also delivered to those who had subscribed and paid for them, but the rest could not be negotiated.

In the meantime the contractors had filed mechanics' liens for the greater part of the work done, and, these liens not having been satisfied, this action was instituted to subject the property thereto. The Fidelity Trust & Safety Vault Company, the trustee for the bondholders in the mortgage, was made a defendant. An answer was filed by it, as well as by the two corporations and some of the bondholders who appeared for themselves in the action, in which it was alleged that all the contractors knew when their contracts were made that the first mortgage was to be executed upon the entire plant to secure the issue of $60,000 in bonds; that these bonds were to be sold to raise the money to pay for the work; and it was charged that it was agreed that the lien of the mortgage should be superior to the mechanics' liens. This was all denied, and voluminous proof was taken upon the issue. The contractors sold their claims to appellants, who were then substituted as plaintiffs in the action, and maintained that the mechanics' liens were superior to the mortgage.

On final hearing, the court below set aside the report of the commissioner in favor of the mechanics' liens, and adjudged the mortgage executed to secure the bonds to be

an attempt on the part of both companies to give an unlaw-
ful preference to part of their creditors, and to operate
as a transfer of all their property for the benefit of all
their creditors equally.    He also held that neither com-
pany, under its charter, had authority to issue bonds or
make the mortgage, and adjudged the bonds void that
had been delivered to the stockholders in the two com-
panies for their stock at twenty-five cents on the dollar.
He ordered the entire plant sold, and directed that out
of the proceeds should be first paid the balance due on a
purchase-money lien on the land and the claim of the
Frankfort Brick Company; then that the cost be paid,
and the balance of the proceeds be equally distributed
between the rest of the bondholders and the mechanics'
liens.

On the appeal before us from this judgment, it is in-
sisted for the appellants that the mechanics' liens should
have been adjudged priority, and by appellees that all the
bondholders should have been adjudged paid out of the
proceeds of the property in full before anything was paid
to appellants.    The property having sold for much less
than the amount of all claims against it, the right to pri-
ority is the pivotal question in the determination of the
case.    There was no plea that the mortgage executed on
July 27, 1896, to secure the bonds, was made in contem-
plation of insolvency, and with the design to prefer some
of the corporate creditors to others.    The proof is clear
that this mortgage was contemplated from the beginning,
and that all the contracts were made with full knowledge
of it on the part of the contractors, the issue of the bonds,
the mortgage to secure them, and the contracts for the
improvements being all a part of the same scheme.    The
mortgage, having been duly executed, could only be set

aside upon the petition of some person interested, filed within six months after it was put to record. Savings Bank v. McAllister's Adm'r, 83 Ky., 149.

The evidence is very conflicting, but it is insufficient to show that the contractors agreed that the mortgage should be superior to their mechanics' liens. It does show, however, that it was, as we have stated, all one scheme; that the plan was fully explained to all parties, and that the contractors all understood that the bonds were to be issued and mortgage given upon the plant when completed. It also shows that the proceeds of the bonds that were sold, in the main, went into the improvements. The question to be determined, therefore, is, do these facts, the scheme having failed, estop the contractors from asserting their mechanics' liens as against the bondholders, or does the principle that equality is equity apply as between them?

The fact that the bonds were issued without authority does not affect the rights of the parties; for, the contracts and the bonds being all part of one unauthorized scheme, the contractors and the bondholders stand in this respect upon the same plane. The stockholders do not complain, and could not if they would; for they authorized the whole thing, and the corporations have received the benefits.

The law gives a mechanic a lien on the property for the amount due him for his improvements. To destroy this express legal right, there must be something more than a mere knowledge on his part, in a case like this, that the owner of the property expects to put a first mortgage upon it to raise money to pay for the improvements. Boisot, on Mechanics' Liens, section 719.

There appears to have been no communication between the contractors and the parties subscribing for the bonds.

The subscribers were citizens of Georgetown, who each took small amounts, as shown by the evidence, under the persuasion that it was a valuable local improvement that would be beneficial to Georgetown, and enhance the value of property in the city. The subject of waiving their mechanics' liens was never mentioned to any of the contractors. The proof offered by appellee would equally apply to all the material men, but in the contract of one of them, the Frankfort Brick Company, the mechanics' lien is expressly retained. It also appears that another large contractor declined to erect his improvements until the vendor's lien on the property was released, and, when talked to about what could be done if the money was not raised to pay him when due, said that he would sue within a year, but take out no execution, and let the judgment lie. As the mechanic's lien law requires the suit to be brought in one year to preserve the lien, this could only have meant that he did not contemplate releasing his lien. The contractors were not interested in the improvement, but resided at a distance. The claim of one of them is for $11,184.90, another for $4,550, another for $4,-159.69, another for $1,000; and it is hard to believe that men of ordinary business capacity would put, without security, their property, to this amount, in an improvement of a corporation, and look to a second lien on the property, consisting mainly of their own goods, for their pay. About $4,000 of the bonds were issued to the stockholders of the companies, and it is utterly unreasonable that the contractors contemplated that the stockholders should have a lien on the plant, which derived its entire value from their work, superior to them. The bonds bore six per cent., payable in gold, and it was expected to place them at par. If this had been done, there would have been a

[20]

large surplus for distribution among the promoters of
the enterprise after paying all the claims. The mechanics
had no liens upon the proceeds of the bonds, and, if they
waived their liens on the property, they had no security
at all.

We can not conceive that men conducting such business
as those who undertook these improvements could have
contemplated that their liens on the property were to be
subordinate to the bonds, when it was apparent that the
corporation had no means of payment but the bonds, and
it was contemplated that a considerable part of the pro-
ceeds of these bonds would go into the hands of the men
with whom they were contracting, for distribution among
them. If the bonds had all been placed, and the money
by some mischance had not been realized from the pur-
chaser, or if it had been received and wasted, the con-
tractors, according to the contention of appellees, would
have been remediless.

To justify such a conclusion, and destroy a plain stat-
utory lien, the proof should show clearly an express agree-
ment to this effect, or circumstances brought home to the
contractors, requiring a man of ordinary prudence to un-
derstand that he took his contract on these terms. The
seven promoters of the enterprise appear to have put up no
money, except for the thirteen bonds for $100 each that
they subscribed for. The contractors testify that these
men were reputed to be worth several hundred thousand
dollars, and were expected by them to protect the enter-
prise they had undertaken.

The doctrine that equality is equity can not be applied
here, for the reason that the parties did not stand on the
same plane. The contractors have, by statute, a lien, and
this lien, which was fastened upon the property day by

day as the work progressed, is not overthrown by the sub-
sequent failure of the scheme from the inability of the
corporation to sell the bonds as they expected to do. The
contractors had no control over the corporation, were
strangers to it, and, having no voice in the disposition of
the bonds, their rights can not be destroyed by the acts
of others.

The fact that the Georgetown Ice Company did not have
title to the land on which the improvements were made
at the time they were begun does not affect the mechanic's
lien thereon, the property having been conveyed to it
subsequently by the railroad company, pursuant to the
agreement between the two corporations.

The act in force when the contracts were made and the
work done gave the mechanics a lien on the land and the
improvements superior to any mortgage or incumbrance
created subsequently to the beginning of the labor or the
furnishing of the materials. This lien related back and
took effect from the time the work was begun. Acts
1891-93, page 505. We do not see that this statute is lia-
ble to any constitutional objection, as the parties must
all be presumed to have contracted with reference to their
rights as fixed by it. It does not attempt to displace prior
liens, but only to make subsequent liens acquired after
the work is begun subordinate to the mechanic's lien. The
cases relied on for the appellees seem to have involved
statutes which undertook to give the mechanic's lien a
preference over a prior mortgage.

It is also insisted that no lien exists under the stat-
ute on a street railway. The statute is as follows:

"All persons who perform or furnish labor or teams
for the construction or improvement of any canal, rail-
road, turnpike or other public improvement in this Com-

monwealth by contract express or implied, with the owner or owners thereof, or by sub-contract thereunder, shall have a lien thereon and upon all the property and franchises of the owner or owners thereof for the full contract price of such labor, material and teams so furnished or performed, which said lien shall be prior and superior to all other liens theretofore or thereafter created thereon." See Session Acts 1891-93, page 514, section 30.

This section was amended by the act of March 21, 1896, to limit its operation as to prior liens and in some other particulars not material here, as the property in contest was substantially brought into being by the labor and material of the contractors, and appellees' claim was created subsequently, with full notice to them of all facts.

If there could be any doubt that the term "railroad" in the section above quoted would include an electric street railway, under the liberal rule of construction in force in this State, there can be no doubt that the terms "railroad or other public improvement" certainly cover it. A street railroad is, at least, a public improvement. By this general term the Legislature intended to embrace everything of this character. A street railroad is as fully within the purview and spirit of the act as a railroad or turnpike would be.

The cases to which we are referred by counsel appear to have been decided under statutes materially different from ours, and without reference to the rule adopted in this State, that statutes in derogation of the common law are not taken strictly, but are liberally construed, with a view to promote their objects. Kentucky Statutes, section 460.

The act of March 21, 1896, took effect ninety days after its passage, or on June 21, 1896. By the third section of

this act, the time for filing a mechanic's lien, which was limited by the original act to sixty days, was changed to six months; and by the first section of it the lien of the mechanic did not affect a subsequent mortgagee without notice, unless before the recording of the mortgage there was a statement filed in the county clerk's office that the work was done or was expected to be done. See Kentucky Statutes, sections 2463, 2468.

All the contracts were made in this case, and all the work was done, as we understand the record, before this act took effect, and must be governed by the law then in force. If any contractor failed to file his claim within the sixty days after he quit work, and the time for filing it had not expired when the second act took effect, extending the time for filing such claims, he might then file it within the time so extended; but, in this event, his right of priority must also be determined by that act, as he can not be allowed to get in his claim under one section of it without subjecting himself to the other conditions imposed by it.

The claim of Sulzer, Vogt & Co., for $11,184.90, was filed on June 15th, or five days after they quit work, and is governed by the original act then in force. The claim of the Buckeye Engine Company was filed June 20, 1896, and within sixty days after they quit work. This is also within the original act. The fact that the Fulton Steam Boiler Works and Joseph McWilliams did part of this work as sub-contractors under the Buckeye Engine Company did not deprive that company, with whom alone the contract was made, of the right to file a mechanics' lien for the full amount due on the contract, the sub-contractors having turned over their claims to it. There seems to be no dispute about the claim of the Frankfort Brick Company, and, as all the claims are now owned by appel-

lants, there will perhaps, on the return of the case, be no difficulty, under the principles we have stated, in settling the rights of the parties in the fund in contest.

Judgment reversed, and cause remanded for a judgment and further proceedings not inconsistent with this opinion.

CASE 54—ACTION TO ENFORCE JUDGMENT RENDERED IN INDIANA—Nov. 24.